**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PCM SALES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-CV-02334 |
| | ) | |
| BLAKE REED, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This is a case about an employment contract. When Blake Reed started selling information technology products at PCM Sales, Inc., he signed an employment agreement containing covenants restricting him from disclosing PCM Sales' confidential information, soliciting PCM Sales' customers, or otherwise competing with PCM Sales after his employment with PCM Sales terminated. Shortly after leaving his job at PCM Sales, Reed accepted a job at one of PCM Sales' direct competitors and began selling information technology products to his former PCM Sales clients. Predictably, PCM Sales filed suit against Reed, alleging breach of contract, conversion, breach of the fiduciary duty of loyalty, and tortious interference with prospective business relations. PCM Sales now moves for summary judgment on each of those claims. Reed also moves for summary judgment on his counterclaim seeking a declaratory judgment that the restrictive covenants in his employment agreement are unenforceable. For the reasons set forth below, the court grants in part and denies in part PCM Sales' motion for summary judgment and denies Reed's motion for summary judgment.

## BACKGROUND

Blake Reed was an account executive at PCM Sales, Inc., which sells computer hardware and software as well as information technology services to companies with fewer than 5,000

employees.[1]  PCM Sales is incorporated and has its principal place of business in California. It is a wholly-owned subsidiary of PCM, Inc., a Delaware corporation. Approximately 20% of PCM, Inc. and its subsidiaries' workforce is located in Ohio, including its Vice President of Human Resources, who oversees all of PCM's human resources functions. All of PCM, Inc.'s human resources functions flow through Ohio, and as a result, almost all of its employee agreements include Ohio choice of law clauses. At the time Reed was hired, PCM's President was also based in Ohio.

Reed's job was to market and sell PCM Sales' products and services to new and existing customers. He was based out of PCM Sales' Chicago office.  Initially, Reed had a nationwide sales territory, but PCM Sales subsequently shifted to a regional model under which Reed focused on eight states. It was typical for Account Executives to develop strong working relationships with individuals responsible for purchasing information technology products at PCM Sales' actual and prospective customers. To that end, when Reed started at PCM Sales, he was assigned a number of existing customer and prospective customer accounts, and provided with comprehensive information about them from PCM Sales' customer relationship information (CRM) database. The CRM database included customer contact information, descriptions of customers' technology needs and preferences, and detailed purchasing and pricing history.

When Reed started working at PCM, he signed an employment agreement that contained non-disclosure, non-competition, and non-solicitation clauses.  The non-disclosure clause read:

> I acknowledge by virtue of employment, or continued employment with PCM, I will possess confidential information and that PCM requires that I take reasonable steps to ensure that I do not disclose confidential information. . . .

---

[1] Unless otherwise noted, the facts recited in this opinion are undisputed.

> I further acknowledge that all confidential information is and
> remains the exclusive property of PCM or its customers, whether
> or not prepared in whole or in part by me. During my employment
> with PCM and at all times thereafter, I will not disclose,
> disseminate, or use any confidential information, except to (a)
> perform my duties on behalf of PCM and as consistent with PCM
> agreement with any third parties, (b) produce information required
> by law, pursuant to a lawfully issues subpoena, or (c) produce such
> information as authorized in writing by PCM's Vice President of
> Human Resources or general counsel. I agree to maintain only
> such confidential information as I have a current "need to know" at
> my work station. I further agree that I will not make copies of any
> confidential information unless there is a legitimate business need
> for the reproduction.

Agreement ¶ 3, ECF No. 70-2.  The agreement defined "confidential information" as:

> [A]ll information in whatever form, tangible or intangible, not
> generally known to competitors of PCM or to the public, whether
> disclosed to or learned or developed by me, relating in any way to
> PCM's trade secrets, technology, inventions (whether or not
> patentable), designs, processes and techniques, "know-how,"
> computer programs and systems, technical developments,
> drawings, business strategies, pricing, costs, financing, marketing
> plans, customer, prospect or employee lists of PCM or of any past,
> present or prospective future customer of PCM or any
> compilations of such information as more fully described in
> Paragraph 3 of this Agreement.

Agreement ¶ 1.5, ECF No. 70-2. Paragraph 3 of the agreement, in turn, specifically notes that

"customer and prospect names, addresses, telephone numbers, facsimile numbers, credit card

numbers, contact persons and customer preferences and buying histories" constitute

"confidential information." Agreement ¶ 3, ECF No. 70-2.  The agreement also required Reed to

"immediately return to PCM (and . . . not keep a copy in any form) all confidential information"

upon termination of his employment, for any reason. Agreement ¶ 4, ECF No. 70-2.

The non-solicitation clause in the agreement prohibited Reed from "directly or

indirectly[] induc[ing], attempt[ing] to induce, or assist[ing] others in inducing or attempting to

induce any . . . customer, [or] prospect . . . of PCM . . . that I directly or indirectly, serviced,

developed relationships with, or acquired information about during my employment with PCM to terminate their relationship with PCM (or to refrain from doing business with PCM)." Agreement ¶ 5, ECF No. 70-2. It also prohibited Reed from "interfer[ing] in any other manner, directly or indirectly, with the relationship between PCM and any such person," and restricts Reed from "doing business with any customer or prospect of PCM that I, directly or indirectly, serviced, developed relationships with or acquired information about during my employment with PCM for the purpose of selling products or services in competition with PCM." Agreement ¶ 5, ECF No. 70-2. Each of these contractual limitations was to apply for 12 months after Reed's employment with PCM Sales terminated.

The non-competition clause prohibited Reed from "engag[ing] in competition with PCM either directly or indirectly" for 12 months after his employment with PCM Sales ended. Agreement ¶ 6, ECF No. 70-2. This provision applied throughout the entire United States, as "PCM conducts its business on a national scope." Agreement ¶ 7, ECF No. 70-2. "Competition with PCM" is defined as "directly or indirectly entering into the employ of, rendering service or assistance to, acquiring any financial interest in, or otherwise becoming associated in any way with a competitor of PCM . . . without the prior written approval of PCM's Vice President of Human Resources or General Counsel." Agreement ¶ 1.6, ECF No. 70-2. "Competitor" is also defined in the agreement, but its definition is ungrammatical:

> Any person other than PCM who intends to engage or engages . . . directly or indirectly in the sale of any product or performs any service substantially similar in type or nature as any product sold or service performed by PCM or for any customer who either: (a) is also a customer of PCM, or (b) was a customer of PCM, or (c) is a person whose business PCM has solicited.

Agreement ¶ 1.7, ECF No. 70-2.

With regard to each of these clauses, the agreement defined "PCM" to include all of PCM Sales' "affiliates, parents, holding companies, subsidiaries and any other entity that directly owns, is owned, or is under common ownership with PCM Sales, Inc. now or at any time in the future." Agreement ¶ 1.7, ECF No. 1.1. The definition of PCM explicitly included a PCM Sales affiliate called Abreon, Inc. that specialized in consulting and did not sell information technology products.

The employment agreement also contained an Ohio choice of law clause, as well as reformation and severability clauses noting that if the covenants contained therein were held "invalid or unenforceable for any reason," the "court shall have full discretion to reform such covenant to the maximum extent allowable by law as to geography, duration, and scope" and that "all other provisions of [the] Agreement shall remain fully valid and enforceable." Agreement ¶¶ 8, 14, ECF No. 70-2.

Reed excelled as an Account Executive at PCM Sales. From 2013 to 2015, Reed made sales worth nearly $6 million to customers in 17 different states. Although Reed only worked for PCM Sales for 11 months in 2015, he was still one of the top three salespeople out of the 50 to 80 Account Executives in the Chicago office.

While employed at PCM Sales, Reed recorded customer and prospect information in both the CRM database and a private Microsoft OneNote document entitled "My Notes." The OneNote document contained customer and prospect contact information, information technology needs and preferences, pricing data, past purchases, and upcoming projects.

In November 2015, Reed resigned from PCM Sales, telling his supervisors that he simply needed a break from work. In reality, Reed was actively seeking employment elsewhere. Before he resigned, Reed sent the OneNote document to his personal email address. Shortly after

resigning, Reed contacted at least seven of his top customers—all listed, with relevant information, in the OneNote document—to inform them of his resignation, and told the customers that he would "keep in touch." Murphy Dec. Ex. E., ECF No. 73. The next month, December 2015, Reed was offered, and he accepted, a position in Wisconsin as a Sales Executive at Vantage Point Corporation (VPC), a company that directly competed with PCM Sales in the information technology hardware, software, and services space. Reed's duties at VPC were identical to his former responsibilities at PCM. In contract negotiations with VPC, Reed requested a higher base salary because he would be bringing a "book of business" from PCM Sales to VPC. Reed Dep. 156:13–157:5, ECF No. 70-2; Brubaker Dep. 36:24-40:8, ECF No. 70-3.

And so he did. Although Reed deleted the OneNote document after he was contacted by PCM Sales' counsel, Reed copied the customer contact information from the OneNote document to another document still in his possession. Reed added some of that contact information into VPC's own customer database. The week before he began work at VPC, Reed contacted at least 13 of his former PCM Sales customers—who Reed still had information about from the e-mailed OneNote document—telling several of them that he would be in touch the next Monday. Reed subsequently succeeded in convincing several of his former PCM Sales clients to make purchases from VPC. This group included a customer who agreed to purchase from VPC even though it did not provide the lowest quote because of the good work Reed had done for them when he was with PCM and another customer whose information technology contact solicited a quote from Reed at VPC, although her supervisor explicitly requested she get a quote from PCM Sales. Reed's largest deal so far at VPC—a $215,000 computer sale—derived from an opportunity he first learned about at PCM Sales. Reed admits that he remembers information

about his PCM Sales customers' needs and purchasing history and that he actively used that information to solicit his former PCM clients at VPC. Ultimately, Reed solicited business from 38 former PCM Sales customers, successfully convincing 21 of them to make purchases from VPC. Information about all but one of those customers was present on the OneNote document that Reed emailed to himself while working at PCM. PCM Sales has subsequently experienced a 64% decrease in monthly revenue from the 21 customers to whom Reed made sales at VPC.

PCM Sales filed suit against Reed, alleging that Reed breached his employment agreement and committed common law conversion, breach of his fiduciary duty of loyalty, and tortious interference with PCM Sales' prospective business relations. Reed then filed a counterclaim seeking a declaratory judgment that the restrictive covenants in his employment agreement are unenforceable. PCM Sales now moves for summary judgment on each of its claims, while Reed moves for summary judgment on his counterclaim.

## DISCUSSION

## I.    BREACH OF CONTRACT

PCM Sales straightforwardly contends that the undisputed evidence demonstrates that Reed violated the non-disclosure, non-solicitation, and non-competition clauses in the employment agreement. Reed counters that each of those clauses is unenforceable as a matter of law. To begin, however, the parties dispute the applicable law. PCM Sales argues that the court should enforce the employment agreement's Ohio choice of law clause, while Reed claims that Wisconsin law applies.

### A.    Choice of Law

Illinois law governs the choice of law question in this case. *See Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004) ("Federal courts sitting in diversity apply the choice-of-law rules of the forum state to determine the applicable substantive law."). Illinois typically follows

the Restatement (Second) of Conflict of Laws in making choice of law decisions. *Old Repub. Ins. Co. v. Ace Prop. & Cas. Ins. Co.*, 389 Ill. App. 3d 356, 362, 906 N.E.2d 630, 636 (Ill. App. Ct. 2009). Under Section 187 of the Restatement, where the parties have contracted to apply the law of a particular forum, the parties' choice of law will be respected unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." *Dancor Const., Inc. v. FXR Const., Inc.*, 2016 IL App (2d) 150839, ¶ 73, 64 N.E.3d 796, 812-13 (Ill. App. Ct. 2016) (quoting Restatement (Second) of Conflict of Laws §187 (1971).

Reed argues that both exceptions apply in this case. He asserts that (1) Ohio has no substantial relationship with the parties and (2) Wisconsin public policy should prevent the court from applying Ohio law. Neither of these arguments has merit. First, Reed miscasts the "substantial relationship" requirement, asserting that for a choice of law clause to be valid, there must exist a substantial connection between both parties—and the parties' transaction—and the selected forum. But, as the Restatement itself makes clear, this is a misreading of the law. The commentary to the Restatement lists as a paradigmatic example of an acceptable choice of forum the state "where one of the parties is domiciled or has his principal place of business." Restatement (Second) of Conflict of Laws § 187, cmt. f (1971); *see also Hall v. Sprint Spectrum L.P.*, 376 Ill. App. 3d 822, 826, 876 N.E.2d 1036, 1041-42 (Ill. App. Ct. 2007) (enforcing Kansas choice of law clause based solely on a defendant's status as a Kansas corporation with a principal

place of business in Kansas). One party's substantial connection to the selected forum therefore can render a choice of law clause enforceable.

Although domicile and principle place of business in a forum are the paradigmatic "substantial connections," PCM Sales' connection to Ohio is weighty enough to enforce the choice of law clause at issue. Roughly 20% of the individuals employed by PCM Sales' parent company, PCM Inc., and its subsidiaries, work in Ohio. Ohio is also the venue from which PCM Sales' human resources operations are overseen by PCM's Vice President for Human Resources. Because all of PCM, Inc.'s human resource operations flow through Ohio, nearly all of its employment agreements contain an Ohio choice of law clause. An entity can reasonably choose to contract under the law of a forum where a number of its executives and a substantial portion of its employees reside, and which functions as the hub of its human resources operations. *See, e.g., Flava Works, Inc v. Rossi*, No. 12–cv–1885, 2013 WL 1337326, at *3 (N.D. Ill. Mar. 29, 2013) (upholding an Illinois choice of law clause because the defendant had offices in Illinois).

Second, Reed argues that Wisconsin—and alternatively, Illinois—public policy precludes application of Ohio law to this case. Specifically, Reed argues that Wisconsin law explicitly prohibits reformation of overbroad restrictive covenants in employment agreement, *see* Wis. Stat. § 103.465, which stands counter to Ohio case law liberally permitting courts to reform overbroad restrictive covenants. *See Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975) ("We hold that a covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect the employer's legitimate interests."). In Reed's view, Wisconsin has a materially greater interest in this case than does Ohio, and therefore Ohio law cannot be applied to the extent it conflicts with Wisconsin law. The problem with Reed's argument is that it ignores the second required element of the "public

policy" exception to enforcement of forum selection clauses. That element notes that for a state's greater public policy interest to override the law of a selected forum, that state must be "the state of the applicable law in the absence of an effective choice of law by the parties." *Dancor*, 64 N.E.3d at 812-13.

Here, Illinois substantive law would govern in the absence of an Ohio choice of law clause in the employment agreement. Absent agreement, Illinois follows Restatement (Second) of Conflict of Laws § 188, which identifies a number of factors to be weighed in determining the applicable law, including: the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties. Reed signed the employment agreement in Illinois for the purpose of working in PCM Sales' Chicago office, which he did for two years under the agreement. By contrast, the only connection between the employment agreement and Wisconsin is the fact that Reed unilaterally decided to move to Wisconsin to compete with PCM Sales years after the agreement was signed. That happenstance does not outweigh the substantial connection between the employment agreement and Illinois. *See, e.g,, Integrated Genomics, Inc. v. Kyrpides*, No. 06 C 6706, 2010 WL 375672, at *7 (N.D. Ill. Jan. 26, 2010) (holding that California public policy could not override Illinois law where the only connection between California and the employment contract at issue was that the defendant moved to California for new employment after leaving his position with the plaintiff).

Alternatively, Reed argues that Illinois' public policy of disfavoring, if not prohibiting, reformation of unreasonable restrictive covenants in employment agreements overrides Ohio's liberal reformation policy. *See, e.g., Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 456, 879 N.E.2d 512, 529 (Ill. App. Ct. 2007) ("[W]e note in passing that

allowing extensive judicial reformation of blatantly unreasonable posttermination restrictive covenants may be against public policy, because of the potentially severe effect it could have on the employees who are subject to such covenants."). But this argument is unpersuasive for two reasons: First, that several Illinois courts have expressed reluctance to reform overbroad restrictive covenants does not necessarily a "fundamental policy" make. Although the commentary to § 187 does "not define 'fundamental[,]' [it] does state that the policy must be a substantial one." *Dancor*, 64 N.E.3d at 814 (internal quotation marks omitted). "Fundamental policies include state statutes that make certain contracts illegal or are designed to protect a person from another with superior bargaining power." *Id.* While common law precepts can contribute to the establishment of state policy, the reticence of a handful of Illinois intermediate appellate courts to reform overbroad restrictive covenants carries substantially less force than a duly enacted statute, and does not rise to the level of fundamental state policy. Second, even if it did, Illinois courts' concerns with reformation are tempered when the contract at issue contains a severability or reformation clause—and Reed's employment agreement contained both. *See Arpac Corp. v. Murray*, 226 Ill. App. 3d 65, 80, 589 N.E.2d 640, 652 (Ill. App. Ct. 1992) ("[W]e do not find modification inappropriate where, as here, the agreement specifically allows, in a severability clause, a court to modify its limits if its restrictions are too broad."); *Wyatt v. Dishong*, 127 Ill. App. 3d 716, 719, 469 N.E.2d 608, 610 (Ill. App. Ct. 1984) ("The fairness of the restraint initially imposed is a relevant consideration, but it is much less important where, as here, the covenant specifically allows a court to modify its limits if the original restrictions are too broad." (internal citations omitted)). The court will therefore apply Ohio law in determining the validity of Reed's employment agreement with PCM Sales.

## B.     Definition of PCM

Under Ohio law, "a covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect the employer's legitimate interests." *Raimonde*, 325 N.E.2d at 547. "A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Id*. The factors to be employed in determining a provision's reasonableness include:

> The absence or presence of limitations as to time and space, whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

*Id*.

Reed's principal argument is that the restrictive covenants in his employment agreement are invalid because the agreement's definition of "PCM" includes all affiliates of PCM Sales, and is therefore overbroad. For example, the non-solicitation provision prohibits Reed from "doing business with any customer or prospect of PCM that [Reed], directly or indirectly, serviced, developed relationships with or acquired information about during my employment with PCM for the purpose of selling products or services in competition with PCM." Agreement ¶ 5, ECF No. 70-2. According to Reed, because PCM is defined to include all PCM Sales

affiliates—including those that have nothing to do with the sale of information technology products and services—the non-solicitation provision bans him from soliciting clients to provide goods or services from a wide variety of industries that have nothing to do with his work at PCM Sales. So too with regard to the non-competition clause, which prevents Reed from "engag[ing] in competition with PCM either directly or indirectly." Agreement ¶ 6, ECF No. 70-2. In Reed's view, this clause would prevent him from working in a wide variety of industries that have little, if any, relation to his work at PCM Sales.

Reed is correct that the definition of PCM renders those provisions overbroad. To protect its legitimate interests, PCM Sales need not prohibit its employees from working in—or soliciting customers as part of their work in—industries entirely unrelated to PCM Sales' mission. Doing so excessively burdens their ability to find work while offering little benefit to PCM Sales. *See Facility Servs. & Sys., Inc. v. Vaiden*, 2006-Ohio-2895, at *6 (Ohio Ct. App. June 8, 2006) (holding overbroad a covenant that "bar[red] employment in areas which were merely incidental to [the former employer's] main line of work."). Reed is incorrect, however, in arguing that the overbroad definition of PCM renders the non-solicitation and non-competition clauses of his employment agreement invalid. Under *Raimonde*, trial courts have discretion to reform overbroad covenants, enforcing them "to the extent necessary to protect the employer's legitimate interests." 325 N.E.2d at 547; *see also Cintas Corp. v. Perry*, 517 F.3d 459, 467 (7th Cir. 2008) (noting that *Raimonde* created a "discretionary judicial power to modify unreasonable non-compete provisions").

Reforming the definition of PCM in the employment agreement's restrictive covenants to include only PCM Sales is equitable under the facts of this case. The case for reformation is especially compelling here because the employment agreement makes repeated references to

PCM in the context of Reed's employment with PCM Sales; these references to PCM evince an intent by the parties that PCM mean PCM Sales, notwithstanding the listed definition of PCM. *See, e.g.*, Agreement ¶ 3, ECF No. 70-2 ("During my employment with PCM and at all times thereafter, I will not disclose, disseminate, or use any confidential information…); Agreement ¶ 5, ECF No. 70-2 (prohibiting interference with PCM's relationship with any entity that Reed "serviced, developed relationships with, or acquired information about during [his] employment with PCM"). The court will therefore modify the definition of PCM to include only PCM Sales.

### C.    The Non-Disclosure Provisions

Reed argues that the non-disclosure clause in his employment agreement is unreasonable, and therefore unenforceable, because the definition of "confidential information" includes information about prospective customers and because it contains no time limitation. Neither of these aspects of the non-disclosure clause renders the clause unreasonable.  First, although Reed protests that not being permitted to use the names of PCM Sales' prospective customers renders the non-disclosure provision overbroad, in reality, this limitation goes to the heart of PCM Sales' legitimate interests. Just as an employer expends resources developing relationships with actual customers, *see Premix, Inc. v. Zappitelli*, 561 F. Supp. 269, 276 (N.D. Ohio 1983), an employer may also expend time and resources to learn about potential customers and generate leads for its salespeople. There is nothing untoward about an agreement that prohibits employees from disclosing that information to competitors or to the public, where competitors could access it. While Reed asserts that this would effectively oust him from the industry by preventing him from disclosing information about both PCM Sales customers and non-customers, he is in actuality prohibited only from disclosing confidential information about non-customers to the extent he actually gained that information while in PCM Sales' employ.

Nor is the lack of a temporal limitation in the non-disclosure provision unreasonable. While certain information may become obsolete over time, it is unclear when any particular piece of information will cease having utility. Moreover, the court can discern no reason why Reed would ever need to use PCM Sales' confidential information except to engage in unfair competition against PCM Sales. *See Curry v. Mole Master Servs. Corp.*, No. 97 CA 35, 1998 WL 774586 (Ohio Ct. App. Oct. 29, 1998) (holding that under Ohio law, there is an "accepted notion that no time limit or time restriction should apply to a confidentiality provision").

The undisputed evidence demonstrates that Reed violated the non-disclosure clause. That clause prohibited Reed from using PCM Sales' confidential information for any reason except to "perform [his] duties on behalf of PCM," respond to a lawful subpoena, or comply with a directive from PCM Sales' Vice President for Human Resources or general counsel. The employment agreement explicitly noted that "customer and prospect names, addresses, telephone numbers, facsimile numbers, credit card numbers, contact persons and customer preferences and buying histories" constitute "confidential information." Agreement ¶ 3, ECF No. 70-2. Reed nonetheless admits that he actively used customer information that he learned at PCM Sales to make sales for VPC, PCM Sales' direct competitor. Reed Dep. 51:10-15, 52:1-22, 53:11-18, ECF No. 70-2. Absent a dispute of material fact, the court concludes as a matter of law that Reed violated the non-disclosure provisions of his employment agreement. *See Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 595 (7th Cir. 2012) ("The district court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

### D.    Non-Solicitation Provisions

The non-solicitation clause prohibited Reed from interfering with PCM Sales' relationships with clients that he "directly or indirectly, serviced, developed relationships with,

or acquired information about during [his] employment with PCM." It also banned Reed from "doing business with any customer or prospect of PCM that [he], directly or indirectly, serviced, developed relationships with or acquired information about during [his] employment with PCM for the purpose of selling products or services in competition with PCM." Agreement ¶ 5, ECF No. 70-2.

Reed correctly argues that the non-solicitation provision is overbroad because it prohibits Reed from soliciting the business of any entity that he "acquired information about during his employment with PCM." The "acquired information about" clause has no principled limitation; under the employment agreement, Reed would be prohibited from selling information technology products or services to any entity that he gained even the most miniscule piece of information about during the time he was employed at PCM, even if he had no direct or indirect contact with that entity, and even if he acquired the information from non-confidential sources. It does not matter, moreover, if that information was wholly unrelated to information technology needs; Reed would still be prohibited from selling information technology goods and services to the entity about which Reed received the irrelevant information. Balancing the *Raimonde* factors, the "acquired information about" clause is calculated to stifle Reed's ordinary skill, eliminate standard (as opposed to unfair) competition, and places a burden on Reed disproportionate to the benefit gained by PCM Sales.

Again, however, the interests of the parties can be adequately balanced by eliminating the offending language and keeping the remainder of the non-solicitation provision in-tact. *See Wilson v. Kreusch*, 675 N.E.2d 571, 575-76 (Ohio Ct. App. 1996) (approving of modifications that "struck an appropriate balance between the interests of [the employer], [the former employee], and the public"). The portions of the non-solicitation clause that prohibit Reed from

soliciting the business of PCM Sales customers or prospects that he directly or indirectly serviced or with which he developed relationships protect PCM Sales' legitimate interests. Those limitations prevent Reed from using relationships he developed on PCM Sales' dime to compete with PCM Sales or otherwise interfere with PCM Sales' business, which is the reasonable object of a non-solicitation agreement. Further, the non-disclosure and non-compete agreements buttress this non-solicitation protection by restricting Reed's ability to capitalize on information he may have acquired about potential customers of PCM Sales as to which he had no direct or indirect involvement. Consequently, the non-solicitation provisions of the agreement shall be modified to exclude the references to entities that Reed merely "acquired information about." The provisions prohibiting Reed from interfering with PCM Sales' relationships, soliciting PCM Sales' customers, and inducing PCM Sales' customers to terminate their relationship with PCM Sales are still valid inasmuch as they apply to customers Reed serviced or developed relationships with during his employment at PCM Sales.

The record demonstrates that Reed violated even this narrowed version of the non-solicitation provisions. Reed admits that he successfully solicited the business of his former PCM Sales clients upon starting work at VPC, selling them the same type of products that he previously sold them at PCM Sales. Reed ultimately made sales at VPC to 21 of his former PCM Sales clients, including at least one customer whose information technology purchaser contacted Reed at VPC, although her supervisor instructed her to get a quote from PCM Sales. In short, the undisputed facts show that Reed did "business with . . . customer[s] . . . of PCM that [he] . . . serviced, [or] developed relationships with . . . during [his] employment with PCM [Sales] for the purpose of selling products or services in competition with PCM [Sales]." Agreement ¶ 5,

ECF No. 70-2. The court therefore concludes as a matter of law that Reed violated the non-solicitation provisions of his employment agreement.

###### E.   Non-Competition Provision

Finally, Reed identifies three problems with the employment agreement's non-competition provision. Under this provision, Reed is prohibited from "engag[ing] in competition with PCM either directly or indirectly" for 12 months after his employment with PCM Sales ended. Agreement ¶ 6, ECF No. 70-2. First, Reed argues that the definition of "competition" is overbroad because it includes the provision of any service for a competitor, even if that service is wholly unrelated to the work Reed did at PCM Sales. The court agrees. The employment agreement defines competition as "directly or indirectly entering into the employ of, rendering service or assistance to, acquiring any financial interest in, or otherwise becoming associated in any way with a competitor of PCM." Agreement ¶ 1.6, ECF No. 70-2. This provision goes far beyond what is necessary to protect PCM Sales' legitimate interests, as it prohibits any association with a PCM Sales competitor, no matter how unrelated to PCM Sales' business. If Reed wanted to work for a PCM Sales competitor as, say, its office manager, rather than as a salesman, it is hard to see why it would be reasonable for PCM Sales to bar him from doing so. (The devil is always in the details, of course; there could be fact issues as to the true nature of an employee's role with a competitor and whether it is, or is not, unrelated to their role with their former employer.) But again, the court finds that the provision's overbreadth does not render it wholly invalid. Instead, the non-disclosure provision can be modified to balance the parties' interests by prohibiting Reed only from engaging directly or indirectly in the same or similar activities as he performed for PCM Sales on behalf of one of PCM Sales' competitors. This limitation protects PCM Sales' legitimate interests in ensuring the time and resources it spends training employees does not inure to the benefit of its competitors and in preventing the

inadvertent disclosure of confidential information to competitors. *See Rogers v. Runfola &*

*Assocs., Inc.*, 565 N.E.2d 540, 544 (Ohio 1991) (noting that a former employer had "a legitimate

commercial interest" in protecting its investment in the training and development of employees).

Second, Reed argues that the non-competition provision is overbroad because it prohibits

him from competing with PCM Sales nationwide, while his sales territory at PCM Sales included

only eight states. The problem with this argument is that Reed's duties were not limited to

customers in those eight states. When Reed started at PCM Sales, he had a nationwide sales

territory. In his time at PCM Sales, Reed was the designated point of contact for over a thousand

customers or prospects in 41 different states. Reed ultimately made numerous sales to customers

outside of his eight state territory. Given the nationwide scope of both PCM Sales' business and

Reed's duties at PCM Sales, the nationwide scope of the non-competition provision is reasonable

to protect PCM Sales' legitimate interests. *See Try Hours, Inc v. Douville*, 985 N.E.2d 955, 966

(Ohio Ct. App. 2013) ("[T]he nationwide scope of the covenant not to compete is particularly

necessary in light of the fact that the trucking industry is a multistate industry.").

Third, both parties agree that the definition of "competitor," as written, is nonsensical. It

reads:

> Any person other than PCM who intends to engage or engages . . .
> directly or indirectly in the sale of any product or performs any
> service substantially similar in type or nature as any product sold
> or service performed by PCM or for any customer who either: (a)
> is also a customer of PCM, or (b) was a customer of PCM, or (c) is
> a person whose business PCM has solicited[.]

Agreement ¶ 1.7, ECF No. 70-2. It is unclear how the "or for any customer" clause interacts with

the first portion of the definition. Although Reed argues that the ungrammatical definition of

"competitor" renders the non-competition provision invalid, the court agrees with PCM Sales

that a simple modification—likely correcting a scrivener's error—makes the definition coherent.

This modification reads:

> Any person other than PCM who intends to engage or engages . . . directly or indirectly in the sale of any product or performs any service substantially similar in type or nature as any product sold or service performed by PCM **to** or for any customer who either: (a) is also a customer of PCM, or (b) was a customer of PCM, or (c) is a person whose business PCM has solicited[.]

Adding "to" before "or for any customer" indicates that a competitor is an entity other than PCM Sales that sells products or performs services similar to those provided by PCM Sales "to or for" current, former, or prospective PCM Sales customers. Indeed, the court cannot contrive any other meaning for "competitor" the parties could have intended given the language in the agreement.

Consequently, the non-competition provision in Reed's employment agreement is enforceable as modified. And as with the non-disclosure and non-solicitation provisions, the undisputed record demonstrates that Reed violated the narrowed non-competition clause. Soon after leaving PCM Sales, Reed went to work for VPC, a direct competitor of PCM Sales. At VPC, Reed sold the same or similar products that he sold at PCM Sales to his former PCM Sales clients. Because the undisputed facts demonstrate that Reed performed activities the same or similar to those that he engaged in at PCM Sales for one of PCM Sales' direct competitors, the court concludes that Reed breached the non-competition provision of his employment agreement.

In short, undisputed facts show that, as modified above, Reed breached the non-disclosure, non-solicitation, and non-competition provisions of his employment agreement. The court will therefore grant PCM Sales' summary judgment motion with regard to its breach of contract claim and deny Reed's summary judgment motion on his counterclaim.

### F.    Remedies

#### 1.    Monetary Damages

PCM Sales argues that it is entitled to $107,673 in compensatory damages for lost profits. It calculates this total by noting that it saw a 64% decrease in average monthly sales revenue—or about $104,334 per month—from the 21 PCM Sales customers to whom Reed made a sale at VPC in his first 12 months on the job. PCM Sales then uses Reed's 8.6% average profit margin in 2015 to conclude that it incurred a profit loss of $8,973 monthly, or $107,673 over the course of the year. This loss in profit occurred as Reed made over $1.1 million in sales at VPC to his former PCM Sales customers.

Under Ohio law, in a breach of contract action, lost profits must be "shown with reasonable certainty." *AGF, Inc. v. Great Lakes Heat Treating Co.*, 555 N.E.2d 634, 638 (Ohio 1990). "If the breach prevents the injured party from carrying on a well-established business, the resulting loss of profits can often be proved with sufficient certainty. Evidence of past performance will form the basis for a reasonable prediction as to the future." *Id*. Consequently, a jury could find that PCM Sales has proven a reasonable basis for the computation of damages that measures lost profits to a reasonable degree of certainty.  At this stage, however, the record before the court would also permit a jury to find that PCM Sales' lost profits are something less than $107,673. As Reed argues, the record is bare as to the efforts PCM Sales made to retain Reed's clients after his departure. And at least one declaration submitted by PCM Sales in support of its motion for summary judgment explains that information technology purchasers may have loyalty to their points of contact, suggesting that PCM Sales may not have automatically retained all of Reed's customers even if he did not breach his employment agreement. *See* Butler Dec. ¶ 5, ECF No. 70-3 ("Account Executives cultivate these relationships through frequent customer contact, whether via telephone, e-mail or text message. It is not

uncommon for Account Executives to have daily contact with their top customer accounts. Many customers respond to this level of communication and relationship-building with loyalty."). The court therefore denies summary judgment with regard to the amount of PCM Sales' monetary damages.

### 2. Specific Performance

PCM Sales also seeks specific performance of the employment agreement. Under Ohio law, "specific performance is not an available remedy for breach of an employment contract unless it is explicitly provided for in the contract or by an applicable statute." *Cedar Fair, L.P. v. Falfas*, 19 N.E.3d 893, 895 (Ohio 2014). Here, the employment agreement explicitly provides for a specific performance remedy, noting: "I agree that if I commit or threaten to commit any such breach, PCM has the right to have the provisions of this Agreement specifically enforced by any court having jurisdiction." Agreement ¶ 8, ECF No. 70-2.

With this hurdle overcome, the Court of Appeals of Ohio has held on multiple occasions that non-competition covenants should be specifically enforced even after the time limitation in the employment agreement has expired, if the former employee was in violation of the covenant during the period it was supposed to be operative. *See Homan, Inc. v. A1 AG Servs., L.L.C.*, 885 N.E.2d 253, 259 (Ohio Ct. App. 2008) (specifically enforcing one year of two-year non-competition covenant where employee began to compete one year after his employment with the plaintiff ended); *Trim-Line of Toledo v. Carroll*, No. L-86-176, 1987 WL 7056, at *2-3 (Ohio Ct. App. 1987) (specifically enforcing entirety of one-year non-competition covenant over two years after defendant's employment with plaintiff ended, as the defendant immediately competed with plaintiff after the end of his employment therewith); *see also Runfola*, 565 N.E.2d at 544 (specifically enforcing modified one-year non-competition and non-solicitation covenants years after employee's relationship with former employer terminated). These courts have noted that if

covenants were permitted to expire while the parties dispute their validity, "it would be 'sanctioning litigation as a delay tactic. All an individual would have to do would be to contest the negative covenant in court until the restrictive time period elapsed. If this were true, covenants not to compete would be virtually ineffective.'" *Homan*, 885 N.E.2d at 259 (quoting *Trim-Line*, 1987 WL 7056, at *2).

Here, the undisputed evidence indicates that Reed has been in continuous violation of the non-competition and non-solicitation provisions since January 11, 2016, when he began working for VPC. Because there was a period of 49 days after Reed left PCM Sales but before he joined VPC during which he was neither competing with PCM Sales nor soliciting its customers, the non-competition and non-solicitation provisions will be enforced for 12 months less 49 days—or 316 days—from the date of this opinion.

## II.    TORT CLAIMS

PCM Sales also moves for summary judgment on its tort claims for conversion, breach of fiduciary duty, and tortious interference with prospective business relations.

### A.    Conversion

To prove conversion under Illinois law, a plaintiff must prove "(1) an unauthorized and wrongful assumption of control, dominion, or ownership by a person over the personalty of another; (2) his right in the property; (3) his right to immediate possession of the property; and (4) a demand for possession thereof." *Scheduling Corp. of Am. v. Massello*, 119 Ill. App. 3d 355, 359–60, 456 N.E.2d 298, 302 (1983). Here, PCM Sales argues that Reed converted its confidential information by emailing himself the OneNote file containing PCM Sales' customer information, and continuing to retain information therefrom even after PCM Sales demanded that he delete the file.

The problem with PCM Sales' argument is that, as this court has recently held, Illinois law does not recognize conversion of intangible rights. *See Sheridan v. iHeartMedia, Inc.*, --- F. Supp. 3d ---, 2017 WL 2424217, at *10 (N.D. Ill. June 5, 2017) (quoting *Am. Nat'l Ins. Co. v. Citibank*, 543 F.3d 907, 910 (7th Cir. 2010) ("Illinois courts do not recognize an action for conversion of intangible rights.")). In *Sheridan*, this court rejected the notion that a digital file can be the subject of a conversion claim under Illinois law. 2017 WL 2424217, at *10. "[A]lthough the needs of the digital age could prompt Illinois courts to revisit the scope of the conversion cause of action in the future, the Seventh Circuit and Illinois courts have given no indicia that the Illinois Supreme Court would in fact alter its stance at this time." *Id*. PCM Sales' motion for summary judgment on its conversion claim therefore fails, as it alleges conversion only of intangible information and a digital file.

### B. Breach of the Duty of Loyalty

Under Illinois law, an employee owes a fiduciary duty of loyalty to his employer. To show a breach of fiduciary duty, an employer must show that (1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) such breach proximately caused the injury of which the party complains. *Lawlor v. N. Am. Corp. of Illinois*, 2012 IL 112530, ¶ 69, 983 N.E.2d 414, 433 (Ill. 2012). An employee breaches his fiduciary duty to an employer when he downloads or otherwise takes his employer's customer list while in the plaintiff's employ, and then uses the customer list to compete with the plaintiff after he is no longer employed by the plaintiff. *See Veco Corp. v. Babcock*, 243 Ill. App. 3d 153, 160, 611 N.E.2d 1054, 1059 (Ill. 1993) ("In the absence of a contractual restrictive covenant, **the improper taking of a customer list**, or fraud, former employees may compete with their former employer and solicit former customers so long as there was no demonstrable business activity by the former employee before the termination of employment." (emphasis added)); *see also RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 877 (N.D.

Ill. 2001) ("By downloading or copying the ACT, BAM and NPI data during the course of his employment in order to use it to compete with Roll–Kraft thereafter, Grimes breached his duty of loyalty and fidelity to Roll–Kraft."); *First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 837–38 (C.D. Ill. 2014) ("Employees breach their fiduciary duty when they take action, such as downloading or copying employer data, in order to compete with the employer after their employment has ended.").

Here, Reed did just that: he copied PCM Sales' information into a OneNote document, and emailed himself the document just prior to leaving PCM Sales. Reed argues that he cannot be liable for breaching his duty of loyalty to PCM Sales because there is no evidence on the record that his use of the OneNote document caused PCM Sales to suffer any damages. In support of that position, PCM Sales argues—without citation to any record evidence—that Reed in actuality memorized every piece of information that he used to poach PCM Sales' customers. This farfetched position is undermined by the record, which establishes that Reed copied customer contact information into the OneNote document and emailed it to himself prior to leaving PCM Sales with the intent of using it to contact PCM Sales' customers. He then contacted a number of those former customers, successfully convincing 21 of them to make purchases from VPC. PCM Sales subsequently experienced a 64% decline in average monthly sales revenue to those same 21 customers; it is reasonable to infer that some portion of those sales would have inured to PCM Sales had Reed not breached his duty of loyalty by taking data concerning PCM Sales' customers with him on his way out the door. While, as noted previously, PCM Sales has not placed its total amount of lost profits beyond dispute, the undisputed facts demonstrate that PCM Sales has likely suffered some measure of damages as a result of Reed's

breach of his fiduciary duty. PCM Sales' motion for summary judgment on its breach of fiduciary duty claim will therefore be granted as to Reed's liability.

### C.      Tortious Interference With Prospective Business Relations

To prove tortious interference with prospective business relations, a plaintiff must prove (1) its reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference. *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511, 568 N.E.2d 870, 878 (Ill. 1991). Here, PCM Sales moves for summary judgment, arguing that the undisputed record indicates that Reed tortuously interfered with its prospective business relations by using its customer information to solicit its customers on VPC's behalf.

PCM Sales' argument falls short because the record does not conclusively establish that PCM Sales has a reasonable expectation of entering into a valid business relationship with any particular customer that Reed solicited at VPC. "A history of filling orders for a particular customer does not, by itself, satisfy the requirement of establishing a reasonable expectancy of receiving additional orders from that customer." *U.S. Data Corp v. RealSource, Inc.*, 910 F. Supp. 2d 1096, 1109 (N.D. Ill. 2012). Nonetheless, PCM Sales argues that it had an expectancy of future business with all of its existing customers because of the nature of the industry, wherein Account Executives develop close relationships with customer contacts and customers in turn reward them with loyalty. *See* Butler Dec. ¶ 5, ECF No. 70-3. The problem with that argument is that the declaration on which it relies permits multiple, conflicting inferences. True, it permits the inference that customers purchasing information technology products are unusually loyal to their corporate suppliers. But if customers build loyalty due to their close relationships with

Account Executives, it could be inferred that some customers' loyalty to the Account Executive might be greater than their loyalty to the Executive's employer. Drawing that reasonable inference, PCM Sales would not have a reasonable expectancy of future business with regard to all of Reed's customers, as some of their loyalties may lay with Reed as opposed to PCM Sales.

Indeed, while the court can infer that PCM Sales likely lost some business as a result of Reed's conduct, the record does not establish that PCM Sales had a sufficient expectancy in any particular future relationship to warrant recovery on a tortious interference theory. In its brief, PCM Sales identifies only a single sale in support of its position, in which Reed used information he learned at PCM Sales to solicit a customer he served while at PCM Sales to purchase $215,000 worth of Dell desktop computers. But other than PCM Sales' previous relationship with the customer and the declaration concerning loyalty in the industry—which, again, permits conflicting inferences—PCM Sales cites no evidence that it had a reasonable business expectancy in that particular sale. PCM Sales' motion for summary judgment on its tortious interference claim is therefore denied.

\*       \*       \*

For the foregoing reasons, PCM Sales' motion for summary judgment on its breach of contract and breach of duty of loyalty claims is granted except as to the amount of its monetary damages. The non-competition and non-solicitation provisions of Reed's employment agreement, as modified, shall be specifically enforced for 316 days from the date of this order.

PCM Sales' motion for summary judgment on its conversion and tortious interference in prospective business relations claim is denied. Reed's motion for summary judgment on his counterclaim is denied.


Dated: September 28, 2017

John J. Tharp, Jr.
United States District Judge